**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF NEW YORK**

------------------------------------------------------------------

ANITA FIGUEROA,

               *Plaintiff,*

    v.

THE CITY OF NEW YORK, ELMER THOMAS, in
his individual capacity, TAMARA WILSON, in her
individual capacity,

               *Defendants*.

------------------------------------------------------------------

**Civ. NO. 25-5581**

**COMPLAINT**

**JURY TRIAL DEMANDED**

Plaintiff, ANITA FIGUEROA, by and through her undersigned counsel, THE DISABILITY and CIVIL RIGHTS CLINIC AT BROOKLYN LAW SCHOOL, and EISENBERG & BAUM, LLP, as and for her Complaint against Defendants THE CITY OF NEW YORK, ELMER THOMAS, and TAMARA WILSON, hereby alleges as follows:

**PRELIMINARY STATEMENT**

1.    This case is about the New York City Police Department's ("NYPD") discrimination and harassment of Anita Figueroa, through its agents' repeated ticketing of her vehicle despite a clearly displayed Parking Permit for People with Disabilities ("PPPD") on the dashboard of her car. From October 3, 2022, through March 31, 2024, the NYPD issued Ms. Figueroa at least twelve parking tickets for her failure to comply with alternate street parking requirements, despite her valid PPPD entitling her to park in any No Parking space, including during Street Cleaning hours. The NYPD issued these tickets even though, from October 3, 2022, to March 31, 2024, Ms. Figueroa had a New York City-issued PPPD displayed clearly on her dashboard, in the exact position and placement required by the New York City Department of

Transportation ("DOT").  The correct placement of the PPPD was futile; the NYPD repeatedly issued Ms. Figueroa parking tickets despite Ms. Figueroa's pleas with ticketing agents to take the time to look at her placard and refrain from issuing her a ticket, and despite the fact that Ms. Figueroa contacted her local police station and informed officers of the NYPD's repeated and improper ticketing, asking for officers to stop improperly ticketing her. The City's agents' repeated ticketing of Ms. Figueroa's vehicle despite the presence of a valid PPPD routinely violated federal, state, and city disability laws.

2.      Ms. Figueroa lives with multiple sclerosis (MS) and epilepsy. She has lived with MS for over a decade and with epilepsy for close to 25 years. Ms. Figueroa has poor gait and balance, making walking and standing challenging for her. She uses a cane to provide balance, ease her tense muscles, and to prevent falls. When Ms. Figueroa experiences MS flare ups, which affect her physically, mentally, and emotionally, she needs to use a walker and often has limited use of her arms, requiring her family to assist her with dressing and caring for her personal hygiene.

3.      Ms. Figueroa and her family live in Far Rockaway, facing Jamaica Bay. High winds from Jamaica Bay contribute to what is already a difficult task for Ms. Figueroa: walking to her car, opening the door against the wind, getting inside, moving her vehicle and searching for a new parking spot to comply with alternate side parking rules. When family members are unable to assist her, she is forced to either endure this demanding process alone, risking a fall, seizure, and MS flare up, or risk receiving a parking ticket, causing mental and financial stress.

4.      It is specifically because moving and parking her car became increasingly difficult for Ms. Figueroa that she applied for a PPPD to accommodate her disabilities and to ease the stress both she and her family experienced. Unfortunately, because the NYPD refused to honor and effectuate the reasonable accommodation the DOT provided to Ms. Figueroa, her PPPD, the

emotional and financial stress and anxiety she had hoped the PPPD would alleviate was made significantly worse. Ms. Figueroa has been forced to contest tickets she should never have been issued, spending hours either staring at a computer screen online or traveling and appearing in person for her appeal. Both forms of contesting parking tickets exacerbate her MS symptoms and risk a seizure. Ms. Figueroa has been liable for tickets she did not know existed because NYPD officers removed tickets from her car after realizing she had a valid PPPD. Removing an issued ticket is particularly improper and anxiety-provoking as regardless of whether the ticket is placed on Ms. Figueroa's car, the NYPD still processes the ticket, and Ms. Figueroa must contest or pay it. If Ms. Figueroa does not constantly check the Department of Finance website for outstanding tickets, she risks a default judgment, high fines, and the risk of the City towing her car. Because Ms. Figueroa has no reason to believe the NYPD will respect and honor her reasonable accommodation—her PPPD—or that she will be able to contest improperly issued tickets successfully, she regularly sets aside about $300.00 of her limited finances in case she faces ticketing charges, resulting in an extremely tight budget for necessities and limited food at the end of the month. For years, Ms. Figueroa has felt she is at the mercy of the City.

5.    Even though the NYPD has repeatedly refused to effectuate the reasonable accommodation the DOT provided Ms. Figueroa, the PPPD, approximately two years after Ms. Figueroa received her PPPD, she applied to renew her permit. This was anything but an easy task. Although Ms. Figueroa has not moved since her original PPPD was issued, she never received the renewal application the DOT sends in the mail to all PPPD holders approximately 10 weeks prior to the expiration date of their PPPD. When Ms. Figueroa contacted representatives of the DOT to inquire about her renewal, she was issued a temporary PPPD for a limited duration and received

an application that required her to provide detailed exam notes regarding the severity of her ability to ambulate, an updated MRI, and an EMG.

6.      Scheduling and undergoing an MRI is extremely burdensome for Ms. Figueroa.  As a Medicaid recipient she must first contact her primary care physician to submit a request for the MRI and then wait for its approval. The approval process can take weeks, months, or even years. Ms. Figueroa only recently underwent an MRI for a shoulder injury she received in 2024. The MRI alone can take hours as Ms. Figueroa has a difficult time remaining still due to muscle spasms and often has to repeat the imaging process. Remaining still for hours, lying on a hard, cold surface, tightens her muscles and can trigger an MS flare-up.  She cannot move or walk after the scans and requires additional assistance. It can take days to a week for Ms. Figueroa to recover for the MRI itself.

7.      For these reasons, along with the fact that Ms. Figueroa had submitted an MRI and detailed exam notes for the PPPD issued in February of 2022, essentially just two years prior, Ms. Figueroa sent in her renewal application without an updated MRI, as procuring and undergoing an MRI was simply too burdensome and risked a deterioration in her condition. The DOT denied Ms. Figueroa's renewal application in December of 2024. Ms. Figueroa then appealed the denial, after speaking with a DOT customer representative who informed her a physician's note regarding her mobility would be sufficient. Ms. Figueroa resubmitted a clarified doctor's note documenting her use of a walking cane in her appeal, which the DOT denied in August of 2025. Ms. Figueroa cannot apply for a PPPD for one year from the date the appeal was denied.

8.      Ms. Figueroa brings this lawsuit to compel Defendants to cease unlawful discriminatory practices and to implement policy and procedure changes that will ensure effective practices for honoring city issued disability benefits, full and equal enjoyment, and a meaningful

opportunity to participate in and benefit from the City's issuing of the PPPD. Ms. Figueroa seeks declaratory, injunctive, and equitable relief; compensatory damages; and attorneys' fees and costs to redress Defendants' unlawful discrimination on the basis of disability in violation of Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12131 et seq.; Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794; the New York State Human Rights Law ("NYHRL"), N.Y. Exec. L. § 290 et seq.; and the New York City Human Rights Law ("NYCHRL") (N.Y.C. Admin. Code §§ 8-107(4), 8-107(7), 8-107(15), 8-107(17); and other state and common law causes of action.

## JURISDICTION & VENUE

9.      This Court has subject matter jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3) and (4), as this action arises under the laws of the United States, specifically the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12131 et seq., and Section 504 of the Rehabilitation Act of 1973 ("Section 504"), 29 U.S.C. § 794.

10.     This Court has supplemental jurisdiction over Plaintiff's state and local law claims pursuant to 28 U.S.C. § 1367(a), as those claims are so related to the federal claims that they form part of the same case or controversy under Article III of the United States Constitution.

11.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1) and (2) because Defendant City of New York resides in this District and all events giving rise to Plaintiff's claims occurred within this District, specifically in Queens County, New York.

## THE PARTIES

12.     Plaintiff ANITA FIGUEROA brings this action and is an individual residing at 54-75 Almeda Avenue Apt. 6G, Far Rockaway, New York. She is a mother of six children living on

a fixed income. She is a qualified individual with disabilities within the meaning of the ADA, Section 504, and state and local disability laws.

13.      Ms. Figueroa has been diagnosed with Multiple Sclerosis, a chronic autoimmune disease affecting the central nervous system that causes progressive nerve damage, and epilepsy, a neurological disorder characterized by recurrent seizures. These conditions substantially limit her major life activities including, but not limited to, walking, standing, balancing, neurological function, and brain function.

14.      Defendant CITY OF NEW YORK ("City") is a municipal corporation organized and existing under the laws of the State of New York. The City is a "public entity" within the meaning of Title II of the ADA, 42 U.S.C. § 12131(1), and is a recipient of federal financial assistance within the meaning of Section 504 of the Rehabilitation Act, 29 U.S.C. § 794(b)(1)(A).

15.      At all relevant times, the City has operated the New York City Police Department ("NYPD") as a municipal agency responsible for, inter alia, traffic enforcement throughout the City's five boroughs. The NYPD is not a separate legal entity but rather an agency of the City.

16.      At all relevant times, the City has operated the Department of Transportation ("DOT") as a government agency responsible for managing and maintaining the city's vast transportation infrastructure, including ensuring that transportation facilities and services are accessible to all New Yorkers, including people with disabilities. The DOT is not a separate legal entity but rather an agency of the City.

17.      Defendant ELMER THOMAS is a Traffic Enforcement Agent employed by the City of New York through the NYPD, assigned to the Queens South Traffic Enforcement Unit. He is sued in his individual capacity under state and city law claims only.

18.    Defendant TAMARA WILSON is a Traffic Enforcement Agent Level II employed by the City of New York through the NYPD, assigned to the Queens South Traffic Enforcement Unit. She is sued in her individual capacity under state and city law claims only.

## STATEMENT OF FACTS

### A.    Ms. Figueroa's Disabilities and Medical Condition

19.    Ms. Figueroa has lived with multiple sclerosis ("MS") since 2014-2015 and epilepsy since 2001-2002.

20.    MS is a chronic, immune-mediated disease which causes nerve damage resulting in fatigue, numbness, weakness, trouble walking, vision problems, pain, vertigo, dizziness, mood changes, trouble with bladder function, and cognitive changes.[1] MS does not have a cure, but medications can help manage symptoms.[2]

21.    Epilepsy is a neurological disorder marked by sudden recurrent episodes of sensory disturbances ("auras"), loss of consciousness, migraines, and/or convulsions and seizures.[3]

22.    Ms. Figueroa's MS causes severe fatigue, muscle spasticity, weakness, chronic pain, cognitive dysfunction, and profound mobility impairment.

23.    Ms. Figueroa's mobility is significantly impaired. She requires a cane for daily ambulation and must use a walker during MS exacerbations, or flare-up, ("flare-up"). During severe flare-ups, she becomes bedridden and requires assistance with activities of daily living. Ms. Figueroa also experiences extreme fatigue, difficulty breathing and talking.

---

[1] *Multiple Sclerosis*, Mayo Clinic, accessed Sep. 23, 2025, https://www.mayoclinic.org/diseases-conditions/multiple-sclerosis/symptoms-causes/syc-20350269.
[2] *Multiple Sclerosis*, National Health Service, accessed Sep. 24, 2025, https://www.nhs.uk/conditions/multiple-sclerosis/.
[3] *Epilepsy*, May Clinic, accessed Sep. 24, 2025, https://www.mayoclinic.org/diseases-conditions/epilepsy/symptoms-causes/syc-20350093.

24.    An MS exacerbation, or flare-up, is the occurrence of new MS symptoms or the worsening of preexisting MS symptoms.[4]

25.    Stress is a medically documented trigger for both MS flare-ups and epileptic seizures for Ms. Figueroa. When MS flare-ups are stress related, they are more intense, painful, and take longer to go away. Stress can also trigger a seizure, which then triggers debilitating MS flare-ups. Her treating neurologist has specifically identified stress reduction as a critical component of her treatment plan.

26.    The physical acts of either waiting, for hours, by her window so she can attempt to thwart a ticket and/or walking to her vehicle, moving it for alternate side parking, and searching for new parking spaces causes Ms. Figueroa significant physical pain, exhaustion, and stress that can trigger an MS flare up and potentially lead to a seizure.

**B.    The City's Issuance of a PPPD as a Reasonable Accommodation**

27.    Due to the increasing difficulty of moving and parking her car, Ms. Figueroa applied for a Parking Permit for People with Disabilities ("PPPD").

28.    In recognition of Ms. Figueroa's mobility impairments, the DOT issued her a PPPD on or about February 1, 2022, following medical certification of her disabilities.

29.    Under New York City Traffic Rules § 4-08(o)(1)(ii), a PPPD explicitly permits the holder to park at "any 'No Parking' space regardless of posted hours" including during street cleaning periods.[5]

---

[4] *What it Means When You Have an MS Flare-Up*, Cleveland Clinic, accessed Sep. 24, 2025, https://health.clevelandclinic.org/ms-flare-up.
[5] *Parking Permits for People with Disabilities*, NYC DOT, accessed Sep. 24, 2025, https://www.nyc.gov/html/dot/html/motorist/pppdinfo.shtml#NYCPPPD.

30.     To be issued a PPPD, an applicant "must have a permanent disability that seriously impairs mobility as certified by their personal physician and a physician designated by the New York City Department of Health and Mental Hygiene's Medical Certification Unit."[6]

31.     The PPPD constitutes a reasonable modification to the City's parking regulations that enables individuals with mobility impairments to have meaningful access to on-street parking without the physical burden of repeatedly moving their vehicles.

32.     At all times relevant to this action, Ms. Figueroa has properly displayed her valid PPPD on the driver's side dashboard of her vehicle, a Chevrolet Suburban bearing New Jersey license plate U92NEF, in compliance with applicable regulations.

### C.     The NYPD's Pattern and Practice of Discriminatory Enforcement

33.     Despite the clear legal protection afforded by the PPPD, the City maintains a pattern, practice, and policy of issuing parking violations to vehicles displaying valid PPPDs for the very infractions the permits explicitly exempt.

34.     Between October 3, 2022, to March 31, 2024, Ms. Figueroa received numerous parking violations for alleged street cleaning violations, all issued while her PPPD was properly displayed. These include violations on October 3, 2022; November 7, 2022; March 27, 2023; June 26, 2023; July 17, 2023; August 28, 2023; October 16, 2023; November 20, 2023; January 22, 2024; January 29, 2024; February 26, 2024; March 11, 2024; and July 15, 2024, among others.

35.     The NYPD's traffic enforcement agents routinely issue violations without exiting their vehicles to inspect for PPPDs, employing a "ticket first, verify never" approach that systematically discriminates against permit holders.

---

[6] *Parking Permits for People with Disabilities*, NYC DOT, accessed Sep. 24, 2025, https://www.nyc.gov/html/dot/html/motorist/pppdinfo.shtml#NYCPPPD.

36.     Ms. Figueroa has documented this practice through video recordings showing traffic enforcement agents, including Defendant Thomas, issuing tickets from inside their vehicles without conducting any inspection for disability permits.

37.     On March 11, 2024, Ms. Figueroa recorded Defendant Thomas issuing a violation to her vehicle while remaining seated in his enforcement vehicle, never approaching close enough to observe the PPPD displayed on her dashboard.

38.     Ms. Figueroa recorded Defendant Thomas approach her car and issue her a ticket without exiting his own vehicle. When Defendant Thomas went to place the ticket on the windshield of Ms. Figueroa's car, he saw the PPPD and then removed the ticket. Even though Ms. Figueroa called out to him from her window, asking him to confirm a ticket had actually been issued, Defendant Thomas did not give Ms. Figueroa confirmation of the ticket.

39.     Ms. Figueroa had to pay the ticket even though it was removed from her car.

40.     The violations issued by Defendant Thomas to Ms. Figueroa's properly permitted vehicle include, but are not limited to: October 3, 2022; November 7, 2022; March 27, 2023; June 26, 2023; August 28, 2023; October 16, 2023; January 22, 2024; January 29, 2024; and March 11, 2024.

**D.      The NYPD's Deliberate Indifference to Known Violations**

41.     The NYPD has actual knowledge of its agents' failure to honor PPPDs.

42.     Despite this knowledge, the NYPD has failed to implement any meaningful training, supervision, or accountability measures to prevent the continued unlawful ticketing of PPPD holders.

43.    The NYPD's practice includes instances where agents observe the PPPD after initiating a violation but still process the ticket electronically, forcing the permit holder to contest it through administrative channels.

44.    On November 7, 2022, Defendant Thomas issued a violation to Ms. Figueroa's vehicle but removed the physical ticket after apparently observing the PPPD. The violation was nonetheless processed electronically, went into default when Ms. Figueroa received no notice, and ultimately cost her $128.01 in fines and penalties.

45.    On or around July 15, 2023, Ms. Figueroa filed a complaint with an Investigating Supervisor for the NYPD, Joey Ingram, based on the repeated ticketing of her vehicle despite the presence of a PPPD.

46.    On or around October 6, 2023, Mr. Ingram determined that the summons issued on July 15, 2023, was not supported by traffic regulations because Ms. Figueroa's vehicle displayed a valid PPPD.

47.    On or around March 12, 2024, Ms. Figueroa filed an additional complaint with Mr. Ingram against the relentless ticketing by Defendant Thomas and asked for confirmation that a ticket had been issued the day before, March 11, 2024.

48.    In response, Mr. Ingram sent Ms. Figueroa a copy of the issued ticket, that Ms. Figueroa then paid.

49.    Despite Ms. Figueroa's complaints to Mr. Ingram, the ticketing continued.

**E.    The July 17, 2023 Retaliatory Incident**

50.    On July 17, 2023, Ms. Figueroa observed Defendant Wilson and her partner preparing to ticket her vehicle from inside their enforcement vehicle.

51.     Video evidence confirms that neither officer exited the vehicle to inspect for a PPPD before initiating the violation process.

52.     Ms. Figueroa approached the officers to inform them of her PPPD and her legal right to park in the space. This constituted protected activity under federal, state, and local anti-discrimination laws.

53.     Upon Ms. Figueroa's approach, the driver became hostile, initially refusing to speak with her and directing her to Defendant Wilson. The officers exited their vehicle and began arguing with Ms. Figueroa, culminating in one officer threatening: "It's okay, I got your number, bitch," and when Ms. Figueroa asked what this meant, repeating: "Don't worry, bitch, I got your number."

54.     During the confrontation, the officers insisted that Ms. Figueroa's vehicle had out-of-state plates, despite her attempts to explain her PPPD and her legal right to park in the space.

55.     Fearing for her safety due to the officers' aggressive behavior and threats, Ms. Figueroa retreated to her apartment.

56.     The officers immediately issued a parking violation to her vehicle in direct retaliation for her protected activity.

57.     This retaliatory ticketing occurred immediately after Ms. Figueroa engaged in protected conduct and was intended to punish her for asserting her rights and deter her from future advocacy.

**F.      DOT Refusal of a Reasonable Accommodation**

58.     Ms. Figueroa was first issued a PPPD on or about February of 2022 after the DOT confirmed by medical documentation, including an MRI, that Ms. Figueroa has a permanent disability severely affecting her mobility.  This PPPD was set to expire on or about March 31, 2024.

59.     To renew PPPD's, the DOT sends a letter in the mail about two months before the slated expiration.[7] As part of the renewal process, the DOT requests copies of an applicant's current driver's license, non-driver ID, or NYC municipal ID and copies of the vehicle registrations that an applicant wants listed on the PPPD.[8]

60.     According to 24 RCNY § 16-04, a reevaluation after an applicant has already been approved for a PPPD can be required "at some future time designated by the physician/provider at the time of certification in order to determine whether the applicant continues to have a 'permanent disability seriously impairing mobility.'"[9] The reevaluation decision is not appealable.

61.     Renewal applications must be submitted by mail. The DOT office is closed to the public and does not accept walk-ins.

62.     Prior to Ms. Figueroa's PPPD's expiration date of March 31, 2024, Ms. Figueroa did not receive the renewal application in the mail.

63.     On or about March, 2024, Ms. Figueroa contacted a customer service agent at the DOT about the renewal process and her missing renewal application. In response, the DOT issued her a temporary PPPD while she completed the renewal process.

64.     The temporary PPPD expired on or around October 2024.

65.     During the renewal application process, the DOT requested Ms. Figueroa send updated documents related to her medical care and diagnoses, including a new EMG and MRI.

66.     The process of getting an MRI is very challenging for Ms. Figueroa. Ms. Figueroa is on Medicaid, which means she must obtain referrals from her primary care physician for every

---

[7] *Parking Permits for People with Disabilities (PPPD)*, NYC DOT, last accessed Sep. 29, 2024, https://www.nyc.gov/html/dot/downloads/pdf/nyc-pppd-brochure.pdf.
[8] *Parking Permits for People with Disabilities (PPPD)*, NYC DOT, last accessed Sep. 29, 2024, https://www.nyc.gov/html/dot/downloads/pdf/nyc-pppd-brochure.pdf.
[9] 24 RCNY § 16-04(b).

other service, including an MRI. Before scheduling an MRI, Ms. Figueroa's primary care physician submits a request to Medicaid that is then either approved or denied. This can take anywhere from a few weeks to a few months or longer. Even if the MRI is approved, Ms. Figueroa experiences a mental and physical toll from the procedure alone. She often feels jittery and claustrophobic during the MRI and has a difficult time remaining still due to muscle spasms. The whole process can take hours because she often must repeat the scans due to her inability to remain still. As a result of having to remain still for a long period, her muscles tighten, and her MS symptoms are exacerbated. It can take her hours to days to recover.

67.    For these reasons, Ms. Figueroa did not provide an updated MRI in her PPPD renewal application, instead sending doctor's notes and a completed form her physician filled out per the DOT reapplication instructions.

68.    Upon information and belief, the renewal application also indicated that the DOT wanted Ms. Figueroa to see a rheumatologist. After speaking with her physician about why this would be necessary, and learning it was not as Ms. Figueroa does not have arthritis, she did not submit physician notes from a rheumatologist.

69.    The DOT denied Ms. Figueroa's application for her second PPPD on or around December 11, 2024.

70.    When her application was denied by the DOT, Ms. Figueroa called the phone number at the bottom of the denial letter. The person she spoke with did not know what MS was, but told Ms. Figueroa that physician notes regarding her mobility would be enough evidence of her mobility impairment, and when she sent the requested documents, she would be approved.

71.    Ms. Figueroa appealed the DOT rejection on or around June 30, 2025. She included updated physician notes, which stated, in part, that she continues to rely on a walking cane for mobility purposes.

72.    On August 20, 2025, the DOT denied Ms. Figueroa's appeal for a PPPD, based on the DOT's Physical and Mental Health Hygiene Unit physician finding that Ms. Figueroa no longer has a "permanent disability seriously impairing mobility," stating that the chart note provided did not provide a detailed assessment of her current capacity to ambulate.

73.    A DOT representative told Ms. Figueroa she was not eligible for a new temporary placard because the application for the renewed PPPD had been denied.

74.    Ms. Figueroa is unable to apply for a new PPPD for an entire calendar year.

75.    Now, in order to avoid receiving parking tickets, twice a week Ms. Figueroa must either rely on her family members to move her car or must go and sit in her car for two hours. Weather, both the damp and humidity, is often too much for her while sitting in the car and forces Ms. Figueroa to return to her apartment during the "no parking hours."

76.    On or about July 9, 2025, Ms. Figueroa left her car before the two hour no parking time period had elapsed and was issued a ticket for failing to move her car during street cleaning hours.

77.    The progression of MS varies widely among individuals. Some experience a relapsing-remitting course, with periods of active disease (relapses) alternating with periods of remission (stable symptoms). For these individuals, symptoms may fluctuate over time, but they may not necessarily worsen progressively. Others experience a gradual progression over time, where symptoms gradually worsen but they do not experience significant relapses, while others experience a steady deterioration from the onset of the disease.

78.     MRI's, while used to diagnose MS, cannot predict the severity or progression of the disease. Additionally, not all people with MS have lesions that show on an MRI.

**G.    Physical and Financial Harm Caused by the City's Discrimination**

79.     The NYPD's and the DOT's discriminatory practices have caused Ms. Figueroa severe physical harm directly related to her disabilities.

80.     The stress of receiving unlawful tickets has triggered multiple MS exacerbations, including a severe flare-up following the July 17, 2023 incident that left her bedridden for one week, requiring walker assistance and intensive family care, and a breakthrough seizure on October 16, 2023, triggered by discovering another violation from Defendant Thomas, resulting in emergency room treatment and increased anti-epileptic medication.

81.     When Ms. Figueroa went to reach for the February 26, 2024, ticket, she fell and hurt her shoulder. The shoulder injury resulted in Ms. Figueroa going to the emergency room because she could not lift her arm. Medicaid approved an MRI to be completed on or around September 23, 2025, to view the damage done to her arm.

82.     The frequency of Ms. Figueroa's MS flare-ups has increased from once a month to two to three times per month since the ticketing began, with recovery periods extending from one week to half a month.

83.     Ms. Figueroa has suffered out-of-pocket losses including $128.01 paid for the November 7, 2022, violation that went to default, causing significant financial hardship for her family, which relies on a fixed income and public assistance. This payment resulted in the family being unable to afford food and other necessities that month.

84.     The burden of contesting violations exacerbates Ms. Figueroa's disabilities. Online contestation requires extended screen time that triggers optic neuritis, severe migraines, and seizure risk. In-person hearings require exhausting travel that can trigger MS symptoms.

85.     Ms. Figueroa has missed at least twelve (12) necessary medical appointments due to fear that her vehicle will be ticketed or towed if she parks using her PPPD, resulting in deterioration of her medical condition.

86.     The City's discrimination and denial of reasonable accommodations have deprived Ms. Figueroa of the benefit of her accommodation. She now attempts to move her vehicle despite the physical hardship or relies on family members, defeating the purpose of the PPPD.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION

**Violation of Title II of the Americans with Disabilities Act**
**42 U.S.C. §§ 12131-12132**
**(Against Defendant City of New York)**

87.     Plaintiff repeats and realleges all preceding paragraphs in support of this claim.

88.     At all times relevant to this action, Title II of the ADA, 42 U.S.C. § 12131, et. seq., has been in full force and effect and has applied to Defendant's conduct.

89.     At all times relevant to this action, the United States Department of Justice regulations implementing Title II of the ADA, 28 C.F.R. Part 35, have been in full force and effect and have applied to Defendant's conduct.

90.     Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by such an entity." 42 U.S.C. § 12132.

91.     Federal Regulations implementing Title II of the ADA state "a public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity." 28 C.F.R. 35.130(7)(i).

92.     At all times relevant to this action, Plaintiff was and is diagnosed with MS and epilepsy and is therefore an individual with a disability within the meaning of 42 U.S.C. § 12131(2) and 28 C.F.R. § 35.108(b)(2).

93.     The City is a local government and is therefore a public entity within the meaning of 42 U.S.C. § 12131(1).

94.     As set forth above, Defendant denied Plaintiff the benefits of the PPPD program by repeatedly ticketing her despite the PPPD displayed according to the DOT's directions, failed to make reasonable modifications to its enforcement procedures to ensure PPPDs are honored, utilized methods of administration that have the effect of defeating the purpose of the accommodation program, and failed to train and supervise its agents to prevent discrimination against PPPD holders. Therefore, the City discriminated against Plaintiff on the basis of her disability in violation of the ADA.

95.     As set forth above, Defendant denied Plaintiff a reasonable accommodation by requiring burdensome and unnecessary documentation of a continued permanent disability affecting mobility.

96.     As set forth above, Defendant's policies and practices related to the receipt and processing of the PPPD renewal process, violate federal and NY state and city laws by creating

unreasonable demands for repeated medical documentation, by failing to provide timely and clear application instructions, and by limiting the submission of applications to postal mail alone.

97.     As set forth above, Plaintiff's requested modification—requiring visual inspection for PPPDs before issuing certain violations—is reasonable and would not fundamentally alter its traffic enforcement program.

98.     As set forth above, Plaintiff's requested modification, accepting updated address and vehicle registration documents for renewal applicants with permanent disabilities that substantially limit mobility, like MS, without requiring applicants to undergo burdensome procedures like an MRI, is reasonable and would not fundamentally alter the PPPD renewal process.

99.     As set forth above, the City has acted with deliberate indifference to Plaintiff's federally protected rights, having actual knowledge of the violations but failing to remedy them.

100.    As a direct and proximate result of the City's violations, Plaintiff has suffered and continues to suffer irreparable harm, including denial of program benefits, physical pain and suffering from stress-induced medical exacerbations, out-of-pocket expenses, lost opportunities for medical care, and loss of independence.

**SECOND CAUSE OF ACTION**
**Violation of Section 504 of the Rehabilitation Act**
**29 U.S.C. § 794**
**(Against Defendant City of New York)**

101.    Plaintiff repeats and realleges all preceding paragraphs in support of this claim.

102.    At all times relevant to this action, Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, has been in full force and effect and has applied to the City's conduct.

103.    At all times relevant to this action, the United States Department of Justice's regulations implementing Section 504 of the Rehabilitation Act, 28 C.F.R. pt. 42, subpt. G, have been in full force and effect and have applied to the NYPD's conduct.

104.    Section 504 provides that no "otherwise qualified individual with a disability... shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a).

105.    At all times relevant to this action, Plaintiff was and is diagnosed with MS and epilepsy and is therefore an individual with a disability within the meaning of 29 U.S.C. § 705(21)(A)(iii).

106.    At all times relevant to this action, the City received federal financial assistance. Therefore, Defendant's parking enforcement program and PPPD system constitute a program or activity receiving federal financial assistance pursuant to 29 U.S.C. § 794.

107.    As set forth above, the City has systematically denied Plaintiff the benefits of her PPPD accommodation and meaningful access to its parking program.

108.    As set forth above, the City has failed to provide reasonable accommodations necessary to ensure meaningful access to its programs despite having knowledge of Plaintiff's disabilities.

109.    As set forth above, the City has acted with deliberate indifference to Plaintiff's rights under Section 504.

110.    As a direct and proximate result of the City's violations, Plaintiff has suffered compensable injuries including physical pain and suffering from medical exacerbations, economic losses, and denial of program access.

## THIRD CAUSE OF ACTION

### Retaliation in Violation of the ADA and Rehabilitation Act
### 42 U.S.C. § 12203; 29 U.S.C. § 794(d)
### (Against Defendant City of New York)

111.    Plaintiff repeats and realleges all preceding paragraphs in support of this claim.

112.    The ADA prohibits discrimination against any individual who "has opposed any act or practice made unlawful by [the ADA]" or "made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [the ADA]." 42 U.S.C. § 12203(a).

113.    Section 504 incorporates the anti-retaliation provisions of the ADA. 29 U.S.C. § 794(d).

114.    As set forth above, Plaintiff engaged in protected activity on July 17, 2023, when she opposed the discriminatory ticketing by Officer Wilson and her partner and asserted her rights under the ADA.

115.    As set forth above, the City, through its agents Wilson and her partner acting within the scope of their employment, retaliated against Plaintiff by verbally threatening and intimidating her, issuing a parking violation immediately after she asserted her rights, and creating a hostile and threatening environment intended to deter her from future advocacy.

116.    There is a clear causal connection between Plaintiff's protected activity and the City's adverse actions through its agents.

117.    The City's retaliatory conduct through its agents has deterred and would deter a reasonable person from asserting their rights under the ADA.

118.    The City is liable for the retaliatory acts of its employees acting within the scope of their employment.

119.     As a result of the City's retaliation, Plaintiff has suffered damages including physical manifestations of emotional distress resulting in medical exacerbations and lost opportunities.

## FOURTH CAUSE OF ACTION

**Violation of New York State Human Rights Law**
**N.Y. Exec. Law § 296(2)**
**(Against Defendants City of New York, Thomas, and Wilson)**

120.     Plaintiff repeats and realleges all preceding paragraphs in support of this claim.

121.     At all times relevant to this action, the New York State Human Rights Law ("NYSHRL"), Article 15 of the New York Executive Law § 290 et. seq., has been in full force and effect and has applied to Defendant's conduct.

122.     Pursuant to N.Y. Exec. L. § 296(2)(a), "[i]t shall be an unlawful discriminatory practice for any person, being the owner, lessee, proprietor, manager, superintendent, agent or employee of any place of public accommodation, because of the . . . disability . . . of any person, directly or indirectly, to refuse, withhold from or deny to such person any of the accommodations, advantages, facilities or privileges thereof . . . to the effect that any of the accommodations, advantages, facilities and privileges of any such place hall be refused, withheld from or denied to any person on account of . . . disability . . . or that the patronage or custom threat of any person of or purporting to . . . having a disability is unwelcome, objectionable or not acceptable, desired or solicited."

123.     Pursuant to NYSHRL, discrimination includes "refusal to make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford facilities, privileges, advantages or accommodations to individuals with disabilities." N.Y. Exec. L. § 296(2)(c).

124.    At all times relevant to this action, Plaintiff was and is diagnosed with MS and epilepsy and is therefore an individual with a disability within the meaning of N.Y. Exec. L. § 292(21).

125.    At all times relevant to this action, the City has provided traffic enforcement, parking services, and parking permits for disabled individuals requiring reasonable accommodations, and has therefore operated a place of public accommodation within the meaning of N.Y. Exec. L. § 292(9).

126.    At all times relevant to this action, Defendant Thomas and Defendant Wilson were employed by the City and are therefore agents of a provider of public accommodation within the meaning of N.Y.C. Admin Code § 8-107(4)(a).

127.    Defendants have retaliated against Plaintiff for opposing discriminatory practices in violation of N.Y. Exec. Law § 296(7).

128.    The individual Defendants have aided and abetted discriminatory conduct in violation of N.Y. Exec. Law § 296(6).

129.    As a result of Defendants' violations, Plaintiff has suffered damages including emotional distress, physical injury, and economic loss.

### FIFTH CAUSE OF ACTION
**Violation of New York City Human Rights Law - Disability Discrimination
N.Y.C. Admin. Code §§ 8-107(4), (15)
(Against Defendants City of New York, Thomas, and Wilson)**

130.    Plaintiff repeats and realleges all preceding paragraphs in support of this claim.

131.    At all times relevant to this action, the New York City Human Rights Law ("NYCHRL"), Article 8 of the New York City Administrative Code Executive Law § 101 et. seq., has been in full force and effect and has applied to Defendant's conduct.

132.    The NYCHRL prohibits discrimination by "any person who is the owner, franchisor, franchisee, lessor, lessee, proprietor, manager, superintendent, agent, or employee of any place or provider of public accommodation because of any person's ...disability...directly or indirectly to refuse, withhold from or deny to such person the full and equal enjoyment, on equal terms and conditions, of any of the accommodations, advantages, services, facilities, or privileges of the place or provider of public accommodation." N.Y.C. Admin Code § 8-107(4)(a).

133.    Under the NYCHRL, covered entities must "provide a reasonable accommodation to enable a person with a disability to satisfy the essential requisites of a job or enjoy the right or rights in question provided that the disability is known or should have been known by the covered entity." N.Y.C. Admin. Code § 8-107(15)(a).

134.    At all times relevant to this action, Plaintiff was and is diagnosed with MS and epilepsy and is therefore an individual with a disability within the meaning of N.Y. Exec. L. § 292(21).

135.    At all times relevant to this action, the City has provided traffic enforcement, parking services, and parking permits for disabled individuals requiring reasonable accommodations, and has therefore provided a public accommodation within the meaning of N.Y.C. Admin Code § 8-107(4)(a).

136.    At all times relevant to this action, Defendant Thomas and Defendant Wilson were employed by the City and are therefore agents of a provider of public accommodation within the meaning of N.Y.C. Admin Code § 8-107(4)(a).

137.    Defendants have denied Plaintiff her full and equal enjoyment of public accommodation and failed to both honor and issue the reasonable accommodation of her PPPD. Therefore, Defendant discriminated against Plaintiff within the meaning of the NYCHRL.

138.    Defendants knew or should have known of Plaintiff's disability based on the displayed PPPD and her direct communications.

139.    Defendants' conduct has been willful, wanton, and malicious, entitling Plaintiff to punitive damages under the NYCHRL.

140.    As a result of Defendants' violations, Plaintiff has suffered compensatory and punitive damages.

**SIXTH CAUSE OF ACTION**

**Retaliation in Violation of New York City Human Rights Law**
**N.Y.C. Admin. Code § 8-107(7)**
**(Against Defendants City of New York and Wilson)**

141.    Plaintiff repeats and realleges all preceding paragraphs in support of this claim.

142.    The NYCHRL prohibits retaliation by covered entities against any person who opposes discriminatory practices. N.Y.C. Admin. Code § 8-107(7).

143.    As set forth above, Plaintiff engaged in protected activity on July 17, 2023, when she opposed Defendants' discriminatory ticketing.

144.    As set forth above, Defendant Wilson and her partner engaged in adverse action by threatening Plaintiff and immediately ticketing her vehicle.

145.    The adverse action was causally connected to Plaintiff's protected activity.

146.    Defendants' retaliatory conduct was reasonably likely to deter protected activity.

147.    The City is vicariously liable for its employees' retaliatory acts.

148.    As a result of Defendants' retaliation, Plaintiff has suffered damages.

## SEVENTH CAUSE OF ACTION

### Disparate Impact Discrimination Under NYC Human Rights Law
### N.Y.C. Admin. Code § 8-107(17)
### (Against Defendant City of New York)

149.    Plaintiff repeats and realleges all preceding paragraphs in support of this claim.

150.    The NYCHRL prohibits policies or practices that result in disparate impact to the detriment of a protected group. N.Y.C. Admin. Code § 8-107(17).

151.    The City maintains a facially neutral practice of issuing parking tickets without requiring dashboard inspection for PPPDs.

152.    This practice has a disparate impact on individuals with disabilities who hold PPPDs by subjecting them to unlawful fines, administrative burdens, and denial of accommodations.

153.    There is a direct causal relationship between the City's practice and the disparate impact on PPPD holders.

154.    The City cannot demonstrate that this practice bears a significant relationship to a significant business objective.

155.    Less discriminatory alternatives exist, including mandatory PPPD inspection before issuing certain violations.

156.    As a result of the City's disparate impact discrimination, Plaintiff has suffered damages.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court:

**A. Issue a declaratory judgment** that Defendants' acts and omissions violate the ADA, Rehabilitation Act, NYSHRL, and NYCHRL;

**B. Permanently enjoin** Defendants from:

1.  Issuing parking violations to vehicles displaying valid PPPDs for infractions covered by such permits;

2.  Maintaining policies or practices that result in discrimination against individuals with disabilities;

3.  Retaliating against individuals who assert their rights under disability laws;

4.  Requiring individuals with permanent disabilities that affect their mobility reapplying for PPPDs to undergo physically and mentally burdensome procedures and exams that they have already submitted to the DOT, and that were a basis for the provision of a PPPD, in their original application;

**C. Order the City to**:

1.  Implement mandatory inspection procedures for PPPDs before issuing applicable violations;

2.  Provide comprehensive training to all traffic enforcement personnel on disability rights and PPPD regulations;

3.  Establish accountability measures including tracking of violations dismissed due to PPPDs and disciplinary procedures for repeated violations;

4.  Expunge all parking violations issued to Plaintiff while her PPPD was displayed;

5.  Establish PPPD renewal application procedures that do not require individuals with permanent disabilities that severely affect mobility to repeat invasive, burdensome, exams and procedures that they have already submitted to the DOT;

6.  Issue Plaintiff a PPPD;

**D. Award Plaintiff** compensatory damages under all claims, including:

1.  Out-of-pocket expenses and economic losses;

2.    Physical pain and suffering caused by stress-induced medical exacerbations (for Title II and Section 504 claims);

3.    Emotional distress damages (for state and city law claims only);

4.    Lost opportunities for medical care and other services;

**E. Award Plaintiff** punitive damages against Defendants Thomas and Wilson in their individual capacities under state and city law claims;

**F. Award Plaintiff** reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 12205, 29 U.S.C. § 794a(b), and N.Y.C. Admin. Code § 8-502(f);

**G. Award** pre-judgment and post-judgment interest;

**H. Grant** such other and further relief as this Court deems just and proper.

<u>**JURY DEMAND**</u>

Plaintiff demands trial by jury on all claims so triable.

Dated: October 3, 2025

Respectfully submitted,

Andrew Rozynski, Esq.
**EISENBERG & BAUM, LLP**
24 Union Square East, PH
New York, NY 10003
Tel: (212) 353-8700
Fax: (917) 591-2875
arozynski@eandblaw.com

Leah Wiederhorn
Disability and Civil Rights Clinic
Brooklyn Law School
250 Joralemon Street
Brooklyn, New York 11201
leah.wiederhorn@brooklaw.edu

*Attorneys for Plaintiff*